# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
)
v. ) ID No. 1805005895
)
)
LYNN HARRIS, )
Defendant. )
)

Submitted: May 21, 2025
Decided: July 30, 2025

## MEMORANDUM OPINION

*Upon Consideration of*
*Defendant's Motion for Postconviction Relief.*
**DENIED.**

*Upon Consideration of*
*Counsel's Motion to Withdraw.*
**GRANTED.**

Matthew B. Frawley, Esquire, Department of Justice, Wilmington, Delaware, Attorney for the State of Delaware.

Lynn Harris, Defendant, *Pro Se*.

**BUTLER, R.J.**

This is the Court's ruling on Defendant Lynn Harris' motion for relief under Delaware Rules of Criminal Procedure Rule 61.

## FACTUAL AND PROCEDURAL BACKGROUND

The presentence report and the State's sentencing memorandum, prepared before his sentencing in this case, tell the story of the death of Olethea Willingham.

Mr. Harris and Ms. Willingham were in a 30-year relationship and were the parents of one child. They lived in a house in New Castle, although Mr. Harris was given to taking Olethea's car without her permission and using it to purchase drugs and disappear for days at a time. As a result, without a car, Olethea missed work, and after so much of this, she finally decided she'd had enough. Text messages reveal that she informed Harris that his bags were packed, and he was no longer welcome in her home.[1]

There is no video of Ms. Willingham's last moments, but photographs of the scene depict a bloody, horrific struggle. Olethea was stabbed at least 18 times, with several different knives. Blood splatters and pools demonstrate that she moved to various locations in the house, struggling to get away. She finally expired, wedged between the sink and toilet in the bathroom. Her car was gone; Mr. Harris was found

---

[1] D.I. 48 Exhibit B at A9 in Appendix to Mem. in Support of Mot. to Withdraw as Counsel Pursuant to Rule 61(e)(6) for Lynn Harris (July 29, 2022), *State v. Harris*, Case No. 1805005895.

with it a few days later, still in Wilmington. His only statement was that there had been a struggle, and she died and he lived.

Harris was indicted on charges of Murder, 1st degree, Possession of a Deadly Weapon During Commission of a Felony (PDWDCF), Possession of a Deadly Weapon by a Person Prohibited (PDWBPP), and Unauthorized Use of a Motor Vehicle. The Office of Defense Services assigned counsel to represent him.

## A. Guilty Plea

After the usual pretrial scheduling discussions, Mr. Harris tendered a guilty plea pursuant to a plea agreement. Under the terms of the agreement, he pled guilty to Murder, 2nd degree (carrying a sentence of 15 years to life), a lesser included offense, PDWDCF (carrying a sentence of 2 to 25 years in prison) and PDWBPP (carrying up to 10 years in prison). The plea agreement allowed him to avoid the mandatory life sentence that would follow a guilty verdict on Murder 1st degree and instead subject him to a mandatory sentence of at least 17 years. As to sentencing, the State affirmed that it would seek a life sentence on the Murder 2nd charge but agreed to allow Harris to state a case for a sentence of less than life. A presentence investigation and report were ordered.

**B. Sentencing**

Mr. Harris is a veteran of Superior Court. The presentence report prepared in this case noted six prior convictions, including multiple robberies and a habitual offender petition in 2004.[2]

Sentencing took place on September 19, 2019. At sentencing, the trial judge had the benefit of a full presentence investigative report, a sentencing memorandum filed by the Department of Justice, and a Forensic Psychological Exam prepared by Robert Thompson, Psy.D., on behalf of Mr. Harris at the request of his attorney. This latter report included a family history, educational and vocational history, a psychiatric history, a trauma history, and a substance abuse history. The report was generally sympathetic to Mr. Harris' co-morbid conditions of major depression and substance use disorder. The report also contained Harris' version of the homicide, which relayed an account of disarming Olethea and then, under the influence of alcohol and other drugs, stabbing her when she insisted that he leave the house permanently. It is to be noted that none of these explanations vitiate Harris' responsibility for the charges to which he pled guilty.

---

[2] D.I. 24 Presentence Report (Sept. 13, 2019) at tab 7, *State v. Harris*, Case No. 1805005895; *see also State v. Harris*, Del. Super., ID No. 030500529 (consolidated with ID No. 0305006153), Cooch, J. (Apr. 23, 2004), *as modified* (June 18, 2012).

4

All of these reports were before the sentencing judge, and all were considered carefully in the time leading up to the sentencing. After hearing all the presentations at sentencing, from the family of the victim, the prosecution and the defense, and giving Mr. Harris the opportunity to allocate on his own behalf, the Court concluded that the appropriate sentence was life imprisonment. Harris was sentenced accordingly.

## C.  No Appeal

In tendering a guilty plea, Harris waived his right to file an appeal. Had he done so anyway, the grounds for doing so would have been quite limited. Here, no appeal to the Supreme Court was filed. The matter was essentially closed.

## D.  Defendant Files Rule 61 Motion, Counsel Appointed

On September 17, 2020, Harris filed a *pro se* motion for post-conviction relief under Rule 61. Because his filing occurred within 1 year of his sentencing date, it was a timely filing. He also filed a *pro se* request for appointed counsel. Under Rule 61(e)(3), counsel may be appointed for first postconviction defendants in guilty plea cases where the petition sets forth a "substantial claim that the movant received ineffective assistance of counsel in relation to the plea of guilty." At this point in the developing law under Rule 61, however, the "substantiality" of the claim needed to trigger appointed counsel has not been fleshed out and, more unfortunately, most p*ro se* motions filed by inmates are so poorly articulated that it is difficult, if not

5

impossible, to determine "substantiality" based upon the inmate's handwritten pleading. Thus, the Court elected to appoint counsel for Mr. Harris to at least determine whether there was indeed something "substantial" in his claim to ineffective assistance that may warrant relief.

## E. Rule 61 Counsel Moves to Withdraw

Rule 61 counsel first undertook a review of the discovery that had been provided to defense counsel in the guilt phase proceeding. That review was hampered by the fact that pieces of Defendant's trial counsel's file were missing and parts had to be reconstructed.[3] Those difficulties were eventually overcome, the file was located and Rule 61 counsel was able to access enough information to assess trial counsel's representation of Mr. Harris.

For example, the activity logs of trial counsel reflect many meetings with Harris to discuss his mental state and the option of pleading guilty. They also reflect the strong involvement of the mitigation specialists on staff at the Office of Defense Services, who obtained mental health records from the Rockford Center, Meadowood, Recovery Innovations, and the Department of Corrections.

Trial counsel retained Dr. Thompson and reviewed his draft report before submitting it to the Court. In sum, there is enough information from which Rule 61

---

[3] *See* D.I. 37 E-mail from Stephanie J. Volturo, Chief Conflicts Counsel, to Charles E. Butler, Resident Judge, (Sept. 29, 2021) at 1, *State v. Harris*, Case No. 1805005895.

counsel was able to conclude that trial counsel did not render constitutionally deficient performance in representing Mr. Harris.

After Counsel's motion to withdraw was filed, Harris filled many additional pleadings seeking consideration. The following are the additional[4] *pro se* arguments that Mr. Harris added during the course of Rule 61 counsel's representation. For the sake of completeness, the Court will review each of Harris' claims, both while represented by Rule 61 counsel and those filed after counsel moved to withdraw.

## ISSUES RAISED BY DEFENDANT

### A. Argument 1: Ineffective Assistance in Preparation for Sentencing

The first claim in Harris' original Rule 61 motion is one that trial counsel was ineffective for failing to investigate and marshal all the relevant evidence of the Defendant's mental and emotional state in mitigation of the sentence.

Rule 61 counsel, recognizing the right to effective assistance of counsel at sentencing,[5] recited that trial counsel prepared mitigation for presentation and presented arguments for mitigation at sentencing. His employment of a psychologist/expert to present a mitigation report and use of mitigation staff at the

---

[4] After a Rule 61 counsel makes a motion to withdraw, the defendant has 30 days to file a response to the motion to withdraw. Super. Ct. Crim. R. 61(e)(7); *see also State v. Smith*, 2023 WL 4102774, at *2 (Del. Super. June 20, 2023), *aff'd*, 310 A.3d 429 (Del. 2023) (the defendant filed a response to a Rule 61 counsel's motion to withdraw, and the defendant raised two additional issues for Rule 61 postconviction relief).

[5] *See generally Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Shelton v. State*, 744 A.2d 465, 513 (Del. 1999).

Office of Defense Services belies any suggestion that trial counsel was not aware of his duties as counsel and followed them. As recounted by Rule 61 counsel, the sentencing court weighed Harris' criminal record and the extreme violence of the crime against the factors in mitigation presented, such as his emotional state at the time, his family background and his drug addiction. The Court decided to impose the life sentence after weighing a multitude of factors, all of which were before the Court. Harris presented nothing to Rule 61 counsel that was not presented to the Court via his trial counsel.

## B. Argument 2: Ineffective Assistance in Not Objecting to Double Jeopardy

Harris' Rule 61 motion accused trial counsel of ineffective assistance because he did not raise "double jeopardy" as a bar to being sentenced for PDWDCF and PDWBPP. Rule 61 counsel correctly concluded that there is no double jeopardy bar to prosecution for these two offenses as they each contain elements not common to both.[6]

## C. Argument 3: Request for an Evidentiary Hearing

In an "amendment" to Harris' original Rule 61 motion, added while he was still represented by Rule 61 counsel, he added a request for an evidentiary hearing

---

[6] *Compare* 11 *Del. C.* § 1447 *with* 11 *Del. C.* § 1448. *See also Wescott v. State*, 981 A.2d 1173, 1173 (Del. 2009) (acquittal on PFDCF did not preclude trial and conviction on PFBPP); *Godwin v. State*, 903 A.2d 322, 322 (Del. 2006), *abrogated by Lecates v. State*, 975 A.2d 799 (Del. 2009), and *abrogated by Lecates v. State*, 987 A.2d 413 (Del. 2009) (*Godwin* is still good law regarding its collateral estoppel analysis).

to "clear up" some incorrect statements made at sentencing. Harris claimed that the decedent's sister incorrectly stated that Olethea had lived in Delaware for most of her life when in fact she had lived in New Jersey for most of it. He also wanted a hearing to show that a statement that he got involved in drugs while in prison for robbery was incorrect because in fact he got involved in drugs years later.

Rule 61 counsel correctly recognized that, assuming these statements by family members at sentencing were incorrect, there is no evidence whatsoever their incorrectness had any effect on the sentencing court. The victim impact testimony was raw and painful. Interruption of victim impact witnesses to correct what were at best technical inaccuracies comes at a price that reasonably prudent trial counsel are well advised to avoid. Rule 61 counsel disagreed with Harris that an evidentiary hearing is necessary. The Court agrees that where and when Harris lived with Olethea is of no consequence. When and how he got addicted to drugs is likewise not important. No hearing is necessary.

## D. Argument 4: Collateral Attack on Guilty Plea

Rule 61 counsel recites that Harris argued in his Rule 61 motion that he should be permitted to withdraw his guilty plea. Without specifying any particular basis, Rule 61 counsel walked through the quite thorough guilty plea colloquy and concluded that Harris had not stated any adequate basis upon which to mount a

9

charge against the voluntariness of the plea. Rule 61 counsel therefore was "unable to adopt" Harris' argument to allow him to withdraw his plea.

The Court has likewise reviewed the plea colloquy and finds, as it did when the plea was accepted, that Harris understood the rights he was waiving, the charges to which he was pleading, the potential sentence, and he did so knowingly, intelligently, and voluntarily.

## E. Argument 5: Second Attack on Guilty Plea

In a second amended motion under Rule 61, again while still represented by Rule 61 counsel, Harris launched another attack on his guilty plea, Harris claims that the Court did not directly address the defendant concerning the minimum and maximum penalties for the offenses to which he was pleading guilty. The transcript of the plea colloquy, however, reflects that the Court inquired of the parties as to the minimum and maximum penalties and the State asserted it was a minimum of 17 years and a maximum of life in prison.[7] The Court asked Mr. Harris if he understood the minimum sentence and he agreed.[8] Rule 61 counsel concluded that the plea colloquy complied with Rule 11, that Harris acknowledged his understanding of all elements of the guilty plea agreement and entered it knowingly.

---

[7] D.I. 48 Plea Hearing Transcript (Mar. 29, 2019) at A40 in Appendix to Mem. in Support of Mot. to Withdraw as Counsel Pursuant to Rule 61(e)(6) for Lynn Harris (July 29, 2022), *State v. Harris*, Case No. 1805005895.

[8] *Id*.

Harris also argued that the Truth in Sentencing guilty plea form filled out by the parties recited a minimum sentence of 15 years, not 17. Rule 61 counsel advises that Harris is correct in this respect. But Rule 61 counsel concludes that the error was not prejudicial, as the Court walked through the minimum mandatory sentence of 17 years with the Defendant and the Defendant affirmed that it was 17 years. As referenced by Rule 61 counsel, had the error in the minimum sentence on the TIS form been alluded to during the colloquy, the form would have been corrected quickly and easily. The Defendant was not prejudiced and the claim is not a basis for Rule 61 relief.[9]

In addition to the detailed review requested and performed by Rule 61 counsel, counsel avers that pursuant to Rule 61(e)(7), "counsel is not aware of any other substantial ground for relief available to the movant." With all that said, Rule 61 counsel's motion to withdraw is GRANTED.

---

[9] Actually, it appears that both Harris and his counsel are incorrect. The TIS Guilty Plea Form that was actually entered in Court shows the three charges to which he pled guilty and the 17-year minimum implicated by the plea. *See* D.I. 18 Truth-in-Sentencing Guilty Plea Form in the Presentence Report (Mar. 22, 2019) at tab 3, *State v. Harris*, Case No. 1805005895. The form appended to counsel's motion to withdraw, *see* D.I. 48 Plea Agreement (July 29, 2022) at A27 in Appendix to Mem. in Support of Mot. to Withdraw as Counsel Pursuant to Rule 61(e)(6) for Lynn Harris, *State v. Harris*, Case No. 1805005895, shows only Murder 2nd and PDWBPP and only 15 years minimum. That form is undated. The plea that was entered is signed and dated March 27, 2019, the day before it was accepted by the Court. That is the form upon which the guilty plea was accepted and is consistent with the Court's guilty plea colloquy. It is a fair surmise that the PDWDCF count – adding 2 years minimum – was a late addition in the plea negotiations and Rule 61 counsel somehow had an earlier draft, but regardless, the colloquy was quite clear. There is no error requiring relief.

## DEFENDANT'S *PRO SE* FILINGS SINCE COUNSEL'S MOTION TO WITHDRAW IN JULY 2022

Following Rule 61 counsel's motion to withdraw, there was a hiatus in the pleadings while Rule 61 counsel and the Department of Justice debated what and how much of the discovery that had been handed over to trial counsel (and Rule 61 counsel) could be shared with the Defendant. The informal discovery that had been turned over was pursuant to a protective order that precluded sharing it with the Defendant.[10] Rule 61 counsel, not wishing to run afoul of the protective order, sought release from it in order to give the Defendant the opportunity to fully express whatever response he wanted to concerning Rule 61 counsel's motion to withdraw.

Needless to say, this delayed things.[11] After considerable pushing and pulling, the parties worked out a suitable compromise and Harris was given numerous discs containing pretrial discovery that was otherwise within the protective order. The Department of Corrections agreed to make a computer available to Harris to review the discs. Harris had a lot to say about that arrangement, which further delayed finalization of this review.

In any event, Harris has filed a response to Rule 61 counsel's motion to withdraw. Actually, as he did with Rule 61 counsel, he filed one response and at

---

[10] S*ee* D.I. 9 Mot. for Protective Order (Sept. 10, 2018), *State v. Harris*, Case No. 1805005895; D.I. 10 Order (Sept. 10, 2018), *State v. Harris*, Case No. 1805005895.

[11] *See* Docket entries 50-77 (pleadings and correspondence related to discovery and the protective order), *State v. Harris*, Case No. 1805005895.

least two additional, "supplemental" responses. Again, further delaying finality. When Harris sought leave to file yet another amendment, the Court gave him a last opportunity, which he pursued. Some of these supplemental pleadings simply rehash arguments already dealt with in Rule 61 counsel's quite thorough analysis and repudiation of the same arguments.

## A. Defendant's Responses to Rule 61 Counsel's Motion to Withdraw

Readers of Harris' *pro se* pleadings will see that he began again with "Argument 1," but this gets needlessly confused with his initial *pro se* "Argument 1" in his Rule 61 motion. Therefore, to give Harris his authorial due, the Court will refer to these "post withdrawal supplements" in their place in line behind the first five arguments addressed by Rule 61 counsel.

## B. Argument 6: Defense Counsel Did Not File an Appeal

This argument is raised for the first time in the supplemental pleading. It appears to be accurate: No Notice of Appeal appears on the Superior Court docket. Then again, this was a guilty plea: In the agreement itself, the Defendant agreed that he understood his waiver of the right "to appeal if convicted to the Delaware Supreme Court with the assistance of a lawyer."[12] Given the facial validity of his waiver of the right to appeal, there is no reason why his counsel would be under a

---

[12] D.I. 18 Plea Agreement's Truth-in-Sentencing Guilty Plea Form (Mar. 22, 2019) at 2, question 7, Presentence Report at tab 3, *State v. Harris*, Case No. 1805005895; D.I. 34 Plea Hearing Transcript (Mar. 28, 2019) at 12-13, *State v. Harris*, Case No. 1805005895.

duty to file one. Moreover, filing an appeal presupposes there is some meritorious issue to be raised on appeal.[13] As Rule 61 counsel made clear, and as is clear from the record, there is no arguably meritorious issue in all these pleadings, and so an appeal would have been a waste of time and resources.

## C. Argument 7: Trial Counsel Failed to Investigate Text Messages

Harris recites various pieces of the Rule 16 discovery (apparently, he has had some time to review it now) and the trial attorney's log notes, all to argue that there was evidence that Harris and Olethea had argued about his taking her car and her wanting it back. He says there were text messages between them that he did not respond to, and other messages showing a mutual hostility over his disappearance. Counsel is faulted for failing to secure them from the cell phones and use them to show . . . something.

There are several problems here: First, Harris is apparently right about the text messages. The police had them. In the affidavit of probable cause supporting Harris' arrest warrant, the police recite that "multiple text messages were observed where on 5/4/2018 the victim text messaged Lynn Harris saying he stole her vehicle and

---

[13] *See generally Pinkston v. State*, 91 A.3d 562, 562 (Del. 2014) (no prejudice in failure to file a meritless appeal after guilty plea); *Walker v. State*, 105 A.3d 990, 990 (Del. 2014) (same).

wanted it back. Further, she advised him she was kicking him out of the residence and was packing up his belongings."[14]

If Harris is not aware, none of this evidence is helpful to the Defendant. There is no dispute, from either side, that the two had strife in their relationship and it was particularly rocky on the date of the homicide. The texts prove nothing not already well known. Second, the more one focuses on the text messages, the more one sees not some "heat of passion" or "extreme emotional distress," as Harris argues elsewhere, but a lengthy buildup of hostility, supplying plenty of ammunition for a prosecutor's argument that Harris went to the residence that day for the very clear purpose of killing the decedent. Even if we assume that trial counsel did not actually see the text messages, Harris' portrayal of them serves him no good in this case. He was not prejudiced by their absence. Indeed, he was likely helped.

## D. Argument 8: The Minimum Mandatory in the Plea Agreement

This is essentially a rehash of Harris' original argument 5 above. The basis for denying relief is adequately stated in response to counsel's motion to withdraw and will not be repeated here.

---

[14] D.I. 1 Commitment Ex. B: Affidavit (May 31, 2018) at 12, *State v. Harris*, Case No. 1805005895.

## E. Argument 9: The Defendant's Mental State

Harris again raises his fragile mental/emotional state both before and at the time of the homicide. He apparently feels his trial counsel did not do enough to develop this as a defense and most of these arguments were raised in Argument 1 above.

These arguments ignore the limitations of mental health as a *bona fide* defense to criminal behavior. Mental health comes in myriad shapes and sizes. Many, if not most crimes are committed by people in a precarious psycho/emotional state. It is rarely a defense to a crime. Trial counsel was quite obviously well-aware that Harris fit into the "mitigation but not a defense" mold, which is exactly why Dr. Thompson was hired to buttress and support that argument.

And the arguments were well done. The mitigation packet was thorough, sympathetic to the accused and well-articulated. But not every good argument wins the day. Sometimes there are more compelling arguments that do. The mere fact that Harris' mental state did not persuade the Court to mitigate the sentence does not mean counsel rendered constitutionally ineffective representation. Harris was a repeat offender who killed a woman whom he had shared a home with for some 30 years and left her to die alone in a bathroom. None of those facts are his attorney's fault.

16

**F. Argument 10: Another Request for Counsel and an Evidentiary Hearing**

When Harris' Rule 61 motion and request for appointment of counsel was filed and approved, the request for counsel was referred to the Office of Conflict Counsel ("OCC") for assignment. The Court takes judicial notice that the normal course of these assignments is that the OCC prepares the record for transmittal to conflict counsel. This may include the discovery, trial counsel's records, the transcripts, plea memoranda, et cetera. Per an email that is part of this record, OCC was unable to procure portions of trial counsel's records because they were lost after his guilty plea.[15] While trial counsel's time records are preserved, other materials took longer to locate.

Harris now says that he wants an evidentiary hearing to delve into trial counsel's pretrial and presentence preparations. He says, "Mr. Harris will attempt to demonstrate that [trial counsel] was ineffective at every stage of the proceedings leading up to the sentencing and at the sentencing phase."

Well, that's not good enough. A generalized claim of ineffective assistance is insufficient to require an evidentiary hearing.[16] A hearing need not be convened simply because Mr. Harris wants to go fishing around in the record to see what might

---

[15] D.I. 37 E-mail from Stephanie J. Volturo, Chief Conflicts Counsel, to Charles E. Butler, Resident Judge, (Sept. 29, 2021) at 1, *State v. Harris*, Case No. 1805005895.

[16] *See, e.g., Dawson v. State*, 672 A.2d 1186, 1196 (Del. 1996) (citing *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996) ("the defendant must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal").

17

pop up.[17]  This renewed request for an evidentiary hearing fares no better than Argument 3 above that Rule 61 counsel found insufficient to argue in good faith.

## G. Argument 11: Complaints About Prosecution Comments at Sentencing

While his initial Rule 61 claim was that family members were incorrect in factual statements at sentencing, now he says the prosecutor was inflammatory at the sentencing for calling the bloody crime scene a "horror movie."[18] Harris says trial counsel was ineffective for not objecting to the prosecutor's expression of personal opinion.

Photographs of the crime scene were before the Court at sentencing. Photographs of bloody handprints, footprints, pools and splattering appear throughout the house. Whatever one calls it, it was memorable. Harris confuses a sentencing hearing with a jury trial when a defendant's fate is in the hands of twelve citizens. There is no evidence or suggestion that the judge was swayed by the prosecutor's characterization of the crime scene. Moreover, it is difficult to imagine what, precisely, trial counsel might have said by way of objection to the prosecutor's characterization of the crime scene as a "horror movie." A more detailed explanation

---

[17] *E.g., Deputy v. Taylor*, 19 F.3d 1485, 1493 (3d Cir. 1994) (citing *Mayberry v. Petsock*, 821 F.2d 179, 186 (3d Cir. 1987)).

[18] *See* D.I. 48 Sentencing Transcript (Sept. 27, 2019) at A82 in Appendix to Mem. in Support of Mot. to Withdraw as Counsel Pursuant to Rule 61(e)(6) for Lynn Harris (July 29, 2022), *State v. Harris*, Case No. 1805005895.

of exactly what was in those photographs, minus the adjectival flourish, would not have enured to Defendant's benefit.

## H. Argument 12: Failure to Raise Extreme Emotional Distress as a Mitigating Circumstance

Harris claims that he explained his inner turmoil to trial counsel – Olethea's ultimatum to pack up, the fact that they had argued in the weeks leading up to the homicide, and that she was armed with a knife that he took from her before stabbing her. He says these facts would have lent themselves to a partial defense of extreme emotional distress,[19] which may have mitigated the conviction down from Murder 1st degree to manslaughter.

Extreme emotional distress is a defense to a Murder 1st degree charge, reducing the conviction to manslaughter, a Class B Felony.[20] In order to prove extreme emotional distress, the defendant bears the burden of proof, by a preponderance of the evidence. And it carries this caveat:

> Extreme emotional distress is not reasonably explained or excused when it is caused or occasioned by the accused's own mental disturbance for which the accused was culpably responsible, or by any provocation, event or situation for

---

[19] In response to Harris' Rule 61 motion, Trial counsel advised, "After consideration of the facts of the case as well as the findings of Dr. Thompson, Counsel did not feel there was any realistic possibility of being successful on an extreme emotion distress defense to the jury. In discussing the plea to Mr. Harris, Counsel would have explained to him any alternative courses of action including psychological defenses at trial. Counsel spent numerous hours speaking to Mr. about his case and mental state. . . . In consideration of all these factors Counsel concluded there was no realistic chance of success of such a defense and communicated this to Mr. Harris." Counsel's Response to Mr. Harris's Rule 61 Mot. (Dec. 3, 2024) at 2, *State v. Harris*, Case No. 1805005895.

[20] 11 *Del. C.* § 641

which the accused was culpably responsible, or when there is no causal relationship between the provocation, event or situation which caused the extreme emotional distress and the victim of the murder. Evidence of voluntary intoxication shall not be admissible for the purpose of showing that the accused was acting under the influence of extreme emotional distress.[21]

Harris has claimed repeatedly in his pleadings that he was drinking and taking drugs on the day of the homicide. This was a "mental disturbance" of his own making and immediately takes extreme emotional distress off the table.

If Olethea died of a single stab wound, he may have had something to argue here. The fact that the physical evidence shows she was chased throughout the residence, bleeding profusely, and three different knives were discovered with blood on them strongly suggests this was no "heat of passion" homicide.

And more to the point, he pled guilty. If the issue here involved a conviction for Murder 1st degree and a Rule 61 claiming ineffective assistance in not requesting an extreme emotional distress instruction, perhaps these arguments would have more persuasion. But the fact remains: he pled guilty to Murder 2nd degree, effectively "splitting the difference" between Murder 1st carrying a mandatory life sentence and Manslaughter carrying up to 25 years. He could have gone to trial on Murder 1st degree and perhaps he'd have received an extreme emotional distress instruction allowing for a Manslaughter conviction, but perhaps not. Likely not. The plea agreement gave him the opportunity to seek less than a life sentence – an option a

---

[21] *Id.*

conviction for Murder 1ˢᵗ would not have given him. On these facts, that may have been the best option for him.

The case of *Albury v. State* was one involving a guilty plea to Murder 1ˢᵗ and avoidance of the death penalty and a Rule 61 allegation that trial counsel failed to advise a defendant of a potential extreme emotional distress argument. The Supreme Court said "where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."[22] The Supreme Court affirmed the Superior Court's application of this test which found that a defense based upon extreme emotional distress would be weak and unlikely to succeed. The Court here agrees that extreme emotional distress on the facts in this case was dubious at best.

Besides being unlikely to succeed, a trial and taking a chance on an extreme emotional distress defense had another hurdle: the Defendant also qualified for sentencing as an habitual offender. The fact that he was so qualified was specifically alluded to in the plea agreement.[23] Had he elected to go to trial on Murder 1ˢᵗ degree and obtained a successful extreme emotional distress Manslaughter, he most likely

---

[22] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *Evans. v. Meyer*, 742 F.2d 371, 375 (7th Cir. 1984)).

[23] D.I. 18 Plea Agreement (Mar. 22, 2019) in Presentence Report (Sept. 13, 2019) at Tab 3, *State v. Harris*, Case No. 1805005895.

would have been declared an habitual offender and been sentenced to somewhere between 53 years and life under 11 *Del. C.* §4214(d).[24]

So, under Harris' formulation, trial counsel should have risked mandatory life for Murder 1st degree by going to trial on a weak extreme emotional distress "defense," after which he would have been sentenced to something between 53 years and life. In addition, he'd have lost what value there is to be gained by "acceptance of responsibility" by pleading guilty.

Harris labels trial counsel ineffective for advocating a Murder 2nd plea which carried something between 15 years and life. It is not ineffective to point out that 15 is less than 53. And under either scenario – Murder 2nd or Manslaughter with a habitual petition – the "cap" is a life sentence.[25] Extreme emotional distress would not have protected him from a potential life sentence.

The Court therefore concludes that the plea to Murder 2nd was the most logical of the difficult choices before the Defendant. Trial counsel examined any potentially useful psychiatric/emotional conditions. The viability of any of these in Harris'

---

[24] In the Plea Agreement, Harris acknowledged he qualified as an habitual offender under 11 *Del. C.* § 4214(d). Under that provision, the minimum sentence that may be imposed is the maximum available for that offense. The maximum sentence for Manslaughter and PDWDCF is 25 years each for a total of 50 years; the maximum for PDWBPP is 3 years. Because the maximums become the minimums under habitual offender sentencing, his minimum would have been 53 years. In addition, the statute provides that the maximum for habitual offender sentencing is life in prison.

[25] See 11 *Del. C.* §4214(d) (maximum sentence for habitual offender under subsection d is life imprisonment).

22

defense and the conclusion that extreme emotional distress was not helpful appears accurate, or at least within the bounds of reasonably competent representation.

## I. Argument 13: Trial Counsel Offered the State a Plea Without Consulting Defendant[26]

In his last round of *pro se* pleadings,[27] Harris claims that his counsel was ineffective because he approached the State with an offer to have Harris plead guilty to Murder 2nd and related charges. He says he did not authorize his counsel to make that offer.

The decision to tender a guilty plea belongs to the Defendant. That is why we have a colloquy with the defendant and not his attorney. Harris says the offer to plead to Murder 2nd degree came from his counsel and not from the state. Assuming that is correct, it is not a basis for a finding of ineffective assistance of counsel. Harris seems to think the state would have offered manslaughter and a habitual petition if his attorney had simply stayed quiet. That is sheer speculation on his part. And, as stated above, had the State done so, Harris would have been in a worse position than he was when entering the sentencing phase. Instead of facing 17 to life he would have faced 53 to life.

---

[26] Harris refers to this as "Argument 8" in his final pleading at D.I. 101. His mis-numbering of his many pro se amendments and additions to his prior pleadings is just one of the many vexing features of the Court's review of his Rule 61 motion.

[27] D.I. 101

## J. Argument 14: Failure to Investigate Witness Statements

Apparently, Harris has by now gotten deep into the police reports and other materials obtained through Rule 61 counsel and this dive has gotten him lost in irrelevant details. He says that in the interview notes with his attorney, the attorney identified Harris' brothers, but they were not called.[28] And this violated his constitutional rights.

Notably, this argument is not accompanied by any statement, affidavit, or other material indicating what these brothers have to add to the mix. There are no "statements" by these witnesses that trial counsel failed to investigate. The facts recited above detailing the crime scene would not give rise to any suspicion that Harris' brothers would have anything useful to say. Harris has not met the threshold to warrant further review of this claim.

## K. Argument 15: Counsel Waived Preliminary Hearing

Harris complains that his trial counsel waived his preliminary hearing in the Court of Common Pleas without his consent. He says trial counsel's notes indicate that he did so in return for the state's agreement to provide a copy of the police reports. The Court takes judicial notice that this agreement is a routine arrangement

---

[28] The Court notes that because so many of Harris' pleadings are handwritten and pro se, they are not easily read or understood. This one was particularly difficult because it is also written in almost microscopically small handwriting. The Court therefore responds to what it understands the argument to be, albeit with the aid of a magnifying glass.

made between the prosecution and the defense in Delaware and has become the "exception that swallows the rule" at the early stage of the prosecution.

Harris says that the waiver deprived him of the ability to "seek a lesser included offense for indictment" and to "challenge witness statements." Actually, waiving the preliminary hearing did no such thing: regardless of the preliminary hearing court's ruling on lesser offenses, he could – and likely would – have been indicted by a Superior Court grand jury on Murder 1st degree. And because hearsay is admitted at the preliminary hearing, and the issue is whether the State has a prima facie case, a preliminary hearing is not an occasion to challenge witness statements. Finally, the waiver got his lawyer a copy of the police reports – reports to which he was not entitled under Rule 16. It is almost never ineffective assistance of counsel to get police reports to which counsel is not entitled in return for waiving a hearing at which counsel is not likely to get anything helpful to the defendant's cause.

**L. Argument 16: Failure to Object to Prosecution Comments at Sentencing**.

Harris' final, final argument is that defense counsel failed to object at sentencing when the prosecutor said the victim had been stabbed 18 times, but the autopsy report stated it was 4 times. Harris says that this failure to correct the record might have affected "the verdict."

As to Harris' claim that the autopsy report says the victim was stabbed 4 times, he did not include a copy of the autopsy protocol as an exhibit. The Court does not

25

have one. Taking him at his word, however, does not require further delay awaiting a copy of the autopsy report. It may well be that 4 stab wounds were fatal – the ultimate question for the pathologist – and 14 were not.

Exactly where this "4 stab wounds vs. 18 stab wounds killed the victim" gets you is not clear. It seems a rather macabre argument. The crime scene was quite clearly a bloody mess. In his presentence interview, the Defendant said "I don't remember stabbing her. I was hallucinating. I was up for three days doing drugs…meth and heroin. They say I stabbed her 15 times, but I don't know; I can't remember, that's it."[29] Harris' suggestion that, had his defense attorney popped up at sentencing and urged that Harris "only" stabbed the victim to death 4 times and not 18 would have changed the Court's sentence does not meet the *Strickland* criteria that "but for" counsel's deficient performance, the result would have been different.

## CONCLUSION

It is a weighty duty that befalls a Court in imposing a prison sentence on a fellow human being, all the more so when the sentence is life imprisonment. The Court granted Harris' request for a second appointed attorney to review the work of the first appointed attorney to ensure that Harris was given all the "process" that was "due" and that there was no constitutional or factual error that may have caused some

---

[29] Presentence Report, p. 3. The presentence report, aggravating and mitigating reports by trial counsel and related documents and photographs are sensitive and confidential. They are all available to a reviewing court upon request to the Superior Court's Investigative Services Office.

injustice to Mr. Harris. Having now concluded its review, the Court remains convinced that Harris' guilty plea was fair and his sentence was just. His motion for relief under Rule 61 is **DENIED**.

**IT IS SO ORDERED.**

/s/ Charles E. Butler
Charles E. Butler, Resident Judge

cc: Prothonotary
Matthew Frawley, Deputy Attorney General
Christopher S. Koyste, Esquire
Ralph D. Wilkinson, IV, Esquire